**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO.** |
| | : | |
| **ADAM RITTER,** | : | |
| | : | |
| **Defendant.** | : | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") seeks a Temporary Restraining Order, and thereafter a Preliminary Injunction, against the Defendant Adam Ritter ("Ritter"), along with an Order compelling arbitration before a Financial Industry Regulatory Authority ("FINRA") Arbitration Panel pursuant to Rules 13200 and 13804 of the FINRA Code of Arbitration Procedure. Ritter is presently soliciting Fidelity's customers to transfer their business to his new firm, NewEdge Securities LLC ("NewEdge"), and misusing its confidential and trade secret customer information, which he obtained knowledge of and access to solely as a result of his employment with Fidelity. Ritter's conduct, among other things, breaches his Employee Agreement with Fidelity and violates Illinois and federal law protecting Fidelity's trade secret information.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

2. Ritter is a former Vice President, Financial Consultant in Fidelity's Highland Park, Illinois Branch. He is an adult citizen and resident of the state of Illinois. Ritter is registered with FINRA.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 et seq. See 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.

4. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Venue is proper in this District because Ritter worked in this District and most or all of the conduct alleged in this Complaint occurred within this District.

## NATURE OF THE CASE

6. Through this action, Fidelity seeks temporary and preliminary injunctive and other relief to stop Ritter's continuing violation of his Employee Agreement, and misappropriation and misuse of trade secrets belonging to Fidelity and unfair competition.

7. Ritter, a former Fidelity Vice President, Financial Consultant, has used Fidelity's confidential and trade secret customer information, which he had access to solely by virtue of his employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to his new firm.

2

8.      After engaging in unprofessional conduct at Fidelity, Ritter was permitted to resign, and did resign, on December 19, 2024.  In April of 2025, Ritter joined NewEdge.

9.      Despite his post-employment obligations, since joining NewEdge Ritter has aggressively and blatantly misappropriated Fidelity's confidential and trade secret customer information and used, and continues to use, that information to unlawfully target and solicit Fidelity customers to transfer their accounts to his new firm, as set forth more fully below.

10.      Fidelity seeks a temporary restraining order and thereafter a preliminary injunction requiring Ritter to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Ritter, containing information pertaining to customers Ritter served or whose names became known to Ritter while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or recreated by Ritter from memory or otherwise, and from using Fidelity's confidential and trade secret information concerning Fidelity's customers.  Fidelity also seeks an order prohibiting further solicitation of Fidelity clients by Ritter. This injunctive relief is necessary to end Ritter's unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

11.      The parties are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200.  Accordingly, concurrently with the filing of its motion for injunctive relief, Fidelity also is filing a Statement of Claim with FINRA Dispute Resolution, Inc. seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).

12.      Although the merits of this case will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed.  Once an

injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more. Injunctive relief, therefore, is required to preserve the status quo until the merits of this case can be adjudicated by FINRA.

### FACTS COMMON TO ALL COUNTS

### Fidelity's Unique Customer Development Practices

13.      Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies. *See* Declaration of Charles William Meyers ("Meyers Dec."), attached hereto as **EXHIBIT 1**, at ¶ 4.

14.      Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Ritter, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity. *Id.* at ¶ 5.

15.      Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides. *Id.*

16.      Fidelity provides leads to its Financial Consultants from two primary sources. *Id.* at ¶ 6.

4

17.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person. *Id.*

18.     Fidelity and its affiliates devote tens of millions of dollars per year towards attracting customers to Fidelity's various businesses in a variety of means.  Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.  *Id.*

19.     A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity. *Id.*

20.     Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.  *Id.* at ¶ 7.

21.     In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.  Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.  *Id.* at ¶ 8.

22.     A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.  *Id.*

FP 55095200.4

23.      Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers. *Id.* at ¶ 7.

### Fidelity's Trade Secret Customer Information

24.      Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Ritter, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.  *Id.* at ¶ 9.

25.      Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.  *Id.*

26.      Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.  *Id.*

27.      Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.  *Id.* at ¶ 6.

28.      Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.  *Id.* at ¶ 10.

29.      Fidelity derives substantial economic value from preserving its customer data as a trade secret.  *Id.*

FP 55095200.4

30.     Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data.  In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors. *Id.*

### Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data

31.     Fidelity vigilantly safeguards its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.  Fidelity does not provide its trade secret customer data to competitors.  *Id.* at ¶ 12; *see also* Declaration of Richard Wulforst ("Wulforst Dec."), attached hereto as **EXHIBIT 2**, at ¶ 6.

32.     Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access. Meyers Dec., at ¶ 12; Wulforst Dec., at ¶ 7.

33.     Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet. *See* Wulforst Dec., at ¶ 8 and Exhibit A. Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information.  A true and correct copy of Fidelity's QRC is attached to the Wulforst Dec. as Exhibit B.

34.     Fidelity also protects trade secret customer data by requiring employees, including Ritter, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity, and not to solicit Fidelity customers. Wulforst Dec., at ¶ 9.

35. Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. Meyers Dec., at ¶ 10. Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, et seq.; 17 C.F.R. § 248.1, et seq.

### Ritter Agreed to Protect the Confidentiality of Fidelity's Trade Secret Customer Information and Not to Solicit Fidelity Customers

36. At the time of his resignation, Ritter was a Vice President, Financial Consultant in Fidelity's Highland Park, Illinois office and had been assigned clients to service on behalf of Fidelity. Wulforst Dec., at ¶¶ 4-5.

37. In order for Ritter to service the customers' accounts he was assigned to service, Ritter required access to the customers' confidential personal and financial information. *Id.* at ¶ 5.

38. Ritter specifically acquired access to and knowledge of the names, contact information and confidential financial data for hundreds of Fidelity clients with a total of over $1.4B dollars in assets under Fidelity administration. Moreover, throughout his employment at the Highland Park branch, the confidential information to which Ritter was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved, and as a result Ritter was provided with ongoing access to a pool of continually updated and evolving confidential information about the Fidelity clients he was assigned to service. *Id.* at ¶¶ 5, 7.

39. Fidelity protects its customers' information by requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement. *Id.* at ¶ 9.

8

40. Fidelity records indicate that Ritter executed the Employment Agreement in connection with his initial employment on May 6, 2016. *Id.* A copy of Ritter's May 6, 2016 Agreement is attached to the Wulforst Dec. as Exhibit C. Fidelity records indicate that Defendant Ritter electronically executed Fidelity's Employee Agreement again on May 5, 2020. *Id.* at Exhibit D.

41. In his Employee Agreement, Ritter acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information. Wulforst Dec., at ¶ 10 and Exhibits C-D at ¶ 1.

42. Ritter promised to use Fidelity's trade secrets only in the course of his employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. Wulforst Dec., at Exhibits C-D at ¶ 1.

43. Ritter promised that, upon termination of employment, he would return all Fidelity company property … including but not limited to Confidential Information. *Id.* at ¶ 3.

44. Ritter also promised that following termination of employment he would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.* at ¶ 6.

45. Ritter further promised that for a period of one year following termination of his employment he would not directly or indirectly solicit in any manner or induce or attempt to induce any customer or prospective customer with whom he had personal contact or about whom he otherwise learned confidential information during the course of his employment with the Fidelity. *Id.*

46. Ritter agreed that any violation of the Employee Agreement—including after his termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.* at ¶ 11.

9

47.     As consideration for the Employee Agreements Ritter executed, Fidelity hired him, promoted him, provided him with ongoing access to continually updated confidential business information, compensated him throughout his employment, and provided him with introductory and continuing on-the-job training.  As a Vice President, Financial Consultant, Fidelity assigned Ritter customers with higher assets to service on behalf of Fidelity and provided Ritter with leads to enable him to succeed at Fidelity.  Fidelity further provided Ritter with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Ritter with the Financial Industry Regulatory Authority and the New York Stock Exchange.  Fidelity provided Ritter with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access to and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support. Wulforst Dec., at ¶ 11.

**Ritter Misappropriated Fidelity's Trade Secret Customer Information
And Is Using It For The Benefit Of Himself and His New Employer**

48.     Despite his contractual obligations and his obligations under Illinois law, Ritter misappropriated Fidelity's trade secret customer information and has used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers.  *Id.* at ¶ 13.

49.     Following his resignation, Ritter was sent a letter from Fidelity, reminding him of his post-separation obligations to Fidelity under his employment agreement, including his one-year obligation not to solicit Fidelity clients. *Id.* at ¶ 12. A copy of this letter is attached as Exhibit E to the Wulforst Dec.

50.     After Ritter joined NewEdge, Fidelity began receiving reports that Ritter was soliciting Fidelity customers to transfer their business to his new firm.  Wulforst Dec., at ¶ 13.

51.     Further, multiple clients reported that Ritter had texted them, confirming that Ritter had retained the clients' cell phone information. *Id*.

52.     Accordingly, Fidelity's in-house counsel sent a letter to Ritter reminding him of Ritter's contractual obligations, enclosing a copy of his Employee Agreement, and demanding that he cease any further solicitation of Fidelity customers. Fidelity also enclosed an affidavit for Ritter to sign attesting that he did not have, or had returned, any of its customer information. Fidelity also sent a copy of its letter to Ritter's new firm to ensure that it was aware of Ritter's legal obligations. *Id.* at ¶ 14. A copy of Fidelity's April 18, 2025 letter to Ritter is attached as Exhibit F to the Wulforst Dec.

53.     By email dated April 25, 2025, Ritter's counsel responded to Fidelity's letter. Although Ritter's counsel did not return a signed Declaration, he stated that Ritter had not violated his legal obligations to Fidelity. Ritter's counsel further requested a copy of Fidelity's social media policy and indicated that he was available for a call to address any remaining concerns. Wulforst Dec., at ¶ 15. A copy of Ritter's counsel's email to Fidelity's counsel dated April 25, 2025 is attached as Exhibit G to the Wulforst Dec.

54.     By email dated April 28, 2025, Fidelity's counsel responded to Ritter's counsel providing the social media policy and her availability for a call to discuss the outstanding concerns. Wulforst Dec., at ¶ 16. A copy of counsel's April 28, 2025 email to Ritter's counsel is attached to the Wulforst Dec. as Exhibit H.

55.     Fidelity's counsel did not receive a response to her April 28th email. Wulforst Dec., at ¶ 16.

56.     Thereafter, Fidelity received additional reports from customers that Ritter was soliciting their business. One customer reported that Ritter reached out to him to let him know

that he was with a new firm and talked to him about the ability to move assets over and some of the benefits that he could now provide. *Id.* at ¶ 17.

57.     Another customer said Ritter reached out to her to let him know where he was and what he was doing and provided them with information about moving to his new company. *Id.* at ¶ 18.

58.     Likewise, another customer reported that Ritter had contacted her on LinkedIn and invited her to do business with him at his new firm.  As a result of his solicitation, she decided to transfer her managed IRA to Ritter. *Id.* at ¶ 19.

59.     Accordingly, in May of 2025, outside counsel for Fidelity contacted Ritter's counsel in an attempt to stop Ritter's continuing illegal conduct without resorting to litigation. *Id.* at ¶ 20.

60.     Ritter's counsel responded to Fidelity's outside counsel by providing an affidavit, which was substantially different from the original affidavit requested.  *Id.* at ¶ 21. A copy of the May 2, 2025, affidavit is attached to the Wulforst Dec. as Exhibit I.

61.     As the May 2, 2025 affidavit provided by Ritter's counsel did not address his continuing solicitation, Fidelity's outside counsel sent a revised affidavit to Ritter's counsel on May 28, 2025.  Wulforst Dec., at ¶ 22. A copy of counsel's May 28, 2025 email and attached affidavit is attached to the Wulforst Dec. as Exhibit J.

62.     On June 8, 2025, counsel for Ritter sent a supplemental affidavit signed by Ritter, again not providing the assurances requested by Fidelity; however, representing that Ritter would not initiate contact with customers except to send personal greetings, such as to comment on a sporting event or wish them a Happy Thanksgiving.  Wulforst Dec., at ¶ 23. A copy of the June 6, 2025 supplemental affidavit signed by Ritter attached to the Wulforst Dec. as Exhibit K.

63.     Although the June 6, 2025 affidavit was not sufficient, Fidelity did not commence litigation trusting that Ritter would nevertheless abide by his legal obligations.

64.     Despite Fidelity's repeated attempts to resolve this matter without resort to litigation, Fidelity continues to receive reports from its customers that Ritter has been, and continues to, solicit them.  Wulforst Dec., at ¶ 24.

65.     Specifically, in a meeting with a Fidelity representative on June 9, 2025, a Fidelity customer complained to Fidelity that Ritter had been calling him almost every other business day for a few weeks to solicit bringing his business to his new firm.  He expressed to the Fidelity representative that he wanted the calls to stop. *Id.* at ¶ 25.

66.     On July 7, 2024, another customer also reported that Ritter reached out to him the prior week.  *Id.* at ¶ 26.

67.     And as recently as July 15, 2024, yet another customer reported that Ritter had reached out to him on two separate occasions. *Id.* at ¶ 27.

68.     The only way Ritter could have known that these customers, and the ones that he solicited prior to that, were customers of Fidelity and how to contact them is by exploiting the ongoing access he was given to Fidelity's constantly updated confidential and trade secret information and using his knowledge of that confidential information about Fidelity's clients to identify and target Fidelity clients for his own benefit.

69.     The reports from Fidelity customers confirm that Ritter has Fidelity's confidential and trade secret customer information in his possession and is using that information to solicit customers to transfer their business to him at his new firm, despite any assurances he provided Fidelity to the contrary.

**The Threat of Immediate and Irreparable Harm**
**Fidelity Faces from Defendant's Conduct**

70.     Ritter's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately.  Indeed, the theft and misuse of Fidelity's trade secret customer information to solicit and unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm.  Ritter's conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently private information, which cannot be calculated with precision and cannot be adequately compensated.  *See* Wulforst Dec., at ¶ 28; Meyers Dec., at ¶ 14.

71.     Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations.  The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a) (2012).  The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent.  17 C.F.R. § 248.10 (2017).  Nonpublic personal information is defined to include customer lists from financial institutions, even if those lists contain only names of Fidelity customers because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations.  17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017).  Indeed, these regulations also protect a customer's account information.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

14

72.      Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their identities, contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Ritter, have access to their information and are using it to solicit their business at a new and different securities firm.  *See* Wulforst Dec., at ¶ 29; Meyers Dec., at ¶ 14.

73.      The damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships, or the damage caused when Ritter took and improperly misused confidential and trade secret customer information on behalf of a competing firm.

74.      Fidelity made repeated attempts to resolve this issue without resort to litigation, but Ritter has refused to comply with his legal obligations.

75.      Based on all the foregoing facts and conduct, Ritter prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and other information contained in Fidelity's records; and

- solicitation of Fidelity customers for his own benefit.

76.      Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Ritter's misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of his Employee Agreement and in violation of Illinois law.

FP 55095200.4

77.     Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

78.     Fidelity asks for the Court's assistance in protecting its confidential information and stopping Ritter's knowing and intentional wrongful conduct.

## FIRST CAUSE OF ACTION
### (Injunctive Relief)

79.     Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint, inclusive, as though set forth in full.

80.     In doing the acts described herein, Ritter has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Illinois law, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

81.     Unless Ritter is temporarily, and thereafter preliminarily and permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

(b)     Loss of confidentiality of clients' records, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(c)     Potential future economic loss, which is presently incalculable.

82.     Thus, Fidelity is entitled to temporary and preliminary injunctive relief.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

83.     The allegations of Paragraphs 1 through 82 are incorporated herein by reference with the same force and effect as if set forth in full below.

FP 55095200.4

84.     Ritter's Employee Agreements are valid contracts supported by adequate consideration.

85.     In the Employee Agreement, Ritter acknowledged that as a consequence of his employment with Fidelity, and in order to assist him in performing the duties of a Financial Consultant, Ritter would be given access to Confidential Information about Fidelity's clients.  See Exhibits C-D to the Wulforst Dec., at ¶1.

86.     Pursuant to the terms of his Employee Agreement, Ritter agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. Exhibits C-D to the Wulforst Dec., at ¶ 1.

87.     Ritter promised to use Fidelity's customer information only in the course of his employment with Fidelity and promised not to divulge Fidelity's customer information to third parties such as his new firm.  Exhibits C-D to the Wulforst Dec., at ¶ 1.

88.     Ritter violated the confidentiality and non-disclosure provisions of his Employee Agreements by using Fidelity's confidential customer information on behalf of himself and his new firm, including by using that information to solicit Fidelity clients to transfer their business.

89.     Ritter also promised to return any of Fidelity's customer information in his possession to Fidelity upon termination of his employment. Exhibits C-D to the Wulforst Dec., at ¶ 3.

90.     Ritter sought to circumvent and in fact breached this provision of his Employee Agreement by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory, for competitive use at his new firm.

91.     Ritter also promised that he would not solicit Fidelity customers for a period of one year after his termination.  Exhibits C-D to the Wulforst Dec., at ¶ 6.

17

92.     Ritter breached the non-solicitation provision of his Employee Agreement by using his knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to Ritter at his new firm.

93.     Ritter is violating his contractual obligations and will continue to violate these obligations in the future.

94.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable damage.

95.     In his Employee Agreement, Ritter expressly agreed that violation of the Agreement would cause irreparable damage to Fidelity. *Id.* at ¶ 11.

96.     Unless Ritter is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)     Potential future economic loss, which is presently incalculable.

## THIRD CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq*.)**

97.     The allegations of Paragraphs 1 through 96 are incorporated herein by reference with the same force and effect as if set forth in full below.

98.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Ritter pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq., in one or more of the following respects.

99.     Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.  Fidelity's customer information is not generally known.

100.     Ritter has used Fidelity's customer information without Fidelity's consent.  Ritter engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Ritter owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

101.     Such information is also protected as "non-public" information under federal securities Regulation S-P.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u).  Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Ritter is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

102.     Fidelity derives a significant economic benefit from the above-described trade secrets.

FP 55095200.4

103.    Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Ritter's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

104.    Unless Ritter is temporarily, and thereafter preliminarily and permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)     Potential future economic loss, which is presently incalculable.

105.    Ritter's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

106.    Thus, Fidelity is entitled to temporary and preliminary injunctive relief to enjoin further legal violations.

### FOURTH CAUSE OF ACTION

**(Misappropriation of Trade Secrets and Misuse of Confidential Information in Violation of the Illinois Uniform Trade Secret Act, 765 Ill. Comp. Stat. 1065)**

107.    The allegations of Paragraphs 1 through 106 are incorporated herein by reference with the same force and effect as if set forth in full below.

108.   As described above, Fidelity possessed trade secrets, including the contact and confidential financial and account information of Fidelity customers.

109.   Ritter has used Fidelity's trade secret customer information without Fidelity's consent.  Ritter engaged in this conduct despite a duty to maintain the information's secrecy and limit its use.

110.   Fidelity derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

111.   Fidelity has made efforts that are reasonable under the circumstances to maintain the secrecy and confidentiality of such information.

112.   Ritter is using this information to compete with Fidelity and to injure its relationships with its clients.

113.   By engaging in the conduct described throughout this Complaint, Ritter has acquired, disclosed, and/or used Fidelity's trade secrets and confidential information through improper and/or unauthorized means, without the consent of Fidelity, to the detriment of Fidelity, with actual and/or constructive knowledge of the improper and/or unauthorized means, and for Ritter' own commercial advantage, in violation of the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065.

114.   Ritter's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets and has caused Fidelity irreparable harm and loss.

115.   Accordingly, Fidelity is entitled to temporary and thereafter preliminary and permanent injunctive relief to enjoin further legal violations.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

116.     The allegations of Paragraphs 1 through 115 are incorporated herein by reference with the same force and effect as if set forth in full below.

117.     Ritter's conduct constitutes an unfair method of competition.

118.     As a direct and proximate result of the acts and course of conduct of Ritter described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Existing Business Relations)

119.     The allegations of Paragraphs 1 through 118 are incorporated herein by reference with the same force and effect as if set forth in full below.

120.     Ritter tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to Ritter at his new firm, including through the use of Fidelity's confidential information and trade secrets.

121.     As a direct and proximate result of Ritter's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

122.     Fidelity is entitled to temporary and thereafter preliminary and permanent injunctive relief enjoining Ritter from further acts of tortious interference.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

123.     The allegations of Paragraphs 1 through 122 are incorporated herein by reference with the same force and effect as if set forth in full below.

FP 55095200.4

124. Ritter misappropriated Fidelity's trade secrets and confidential information, Ritter breached his Employee Agreement, and unfairly competed with Fidelity thereby wrongfully benefitting from his actions.

125. As a result of Ritter's wrongful and illegal conduct, he has benefitted in the form of Fidelity customer accounts that have transferred to him at his new firm. Also as a result of the Ritter's wrongful and illegal conduct, Fidelity has suffered harm.

126. Allowing Ritter to benefit from such conduct would be unfair and should be prohibited.

## **PRAYER FOR RELIEF**

For the reasons set forth above, Fidelity respectfully requests that the Court enter an injunction order, until further order of the Court:

1. Enjoining Ritter, effective immediately, from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of Fidelity customers or prospective customers whom Ritter served or whose names became known to him while in the employ of Fidelity;

2. Ordering Ritter to return to Fidelity any and all records, information and/or documents in any form containing information pertaining to customers or prospective customers of Fidelity whom Ritter served or whose name became known to Ritter while in the employ of Fidelity, within five (5) days from the entry of this Court's Order, including any and all copies. This requirement includes all records, information or documents, in any form, created by Ritter, or anyone acting in concert with him, based on documents or information that was received or

23

removed from Fidelity by Ritter and any list of Fidelity customer names that may have been created or recreated by Ritter from memory, or derived from a list created or recreated by Ritter from memory;

3.     Enjoining Ritter, and anyone acting in concert with him, from soliciting or inducing, whether directly or indirectly, any business from any Fidelity customer whom Ritter served or whose name became known to Ritter while in the employ of Fidelity; and

4.     Directing that Fidelity and Ritter, pursuant to the Federal Arbitration Act, 9 U.S.C. §§3-4, shall proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

Dated: August 4, 2025                           Respectfully submitted,

                                                FISHER & PHILLIPS LLP

                                                */s/ Joel W. Rice*
                                                Joel W. Rice
                                                10 South Wacker Drive, Suite 3450
                                                Chicago, IL 60606
                                                TEL: (312) 346-8061
                                                FAX: (312) 346-3179
                                                jrice@fisherphillips.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and accurate copy of the foregoing has been

served this 4th day of August 2025 upon the following via email:

John S. Monical
LAWRENCE KAMIN LAW
300 S. Wacker Drive
Suite 500
Chicago, IL 60606
jmonical@lawrencekaminlaw.com
(312) 924-4262


*Counsel for Defendant Adam Ritter*



*/s/ Joel W. Rice*
Joel W. Rice

FP 55095200.4