# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO.** |
| | : | |
| **ADAM RITTER,** | : | |
| | : | |
| **Defendant.** | : | |

## DECLARATION OF CHARLES WILLIAM MEYERS

I, Charles William Meyers, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am over the age of 18. All statements in this Declaration are based on my personal knowledge, or, where indicated, based on my investigation. I submit this Declaration on behalf of Plaintiff Fidelity Brokerage Services LLC ("Fidelity") in support of its Motion for a Temporary Restraining Order and Preliminary Injunction.

2.  I am currently employed by Fidelity as a Market Leader for Fidelity with supervisory responsibility for nine offices in the Chicago area, including Highland Park, Illinois, and one office in South Bend, Indiana. I have been employed with Fidelity in various capacities for approximately thirty-five years and I have been a Market Leader for the past nine years.

3.  Until his resignation to join NewEdge Securities LLC ("NewEdge"), a directly competitive firm, Defendant Adam Ritter ("Ritter") worked as a Vice President, Financial Consultant ("VPFC") in Fidelity's Highland Park, Illinois Branch. In my capacity as Market Leader, I have supervisory responsibility for the Highland Park, Illinois Branch where Ritter worked.

4.  Fidelity and its affiliates provide a variety of financial services—such as retirement

services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

5.      Fidelity is unique in the retail brokerage field because Fidelity does not have its VPFCs make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity. Instead, assigns existing Fidelity retail customers to its VPFCs to service on its behalf and and also requires its VPFC's to develop service relationships based upon leads that Fidelity provides..

6.      Instead, Fidelity assigns existing customers to its VPFCs and also requires them to develop service relationships based upon leads that Fidelity provides. Fidelity provides leads to its VPFCs from two primary sources. First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person. Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity. Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity. Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity. Further, Fidelity maintains prominent retail locations that prospective customers can visit. A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

7.      Second, Fidelity forwards information to its representatives regarding customers, with whom VPFCs such as Ritter are the face of Fidelity, responsible for developing and sustaining the customer relationships for assigned customers. Fidelity's lead-based approach to supporting its

VPFCs distinguishes Fidelity from other full-service brokerages where individual brokers, rather than the firm, are responsible for establishing customer relationships. Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

8.     For example, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position. Fidelity customers may be serviced by multiple Fidelity representatives depending upon the customers' needs and service offerings in which they opt to participate at Fidelity. A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

9.     Fidelity's success with its unique lead-based approach to supporting VPFCs such as Ritter is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. Fidelity's trade secret customer data includes the names of and contact information for Fidelity customers, and includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth. Although certain information might be publicly available—such as an individual's name or published home telephone numbers—only a limited number of Fidelity employees know who among the general public are Fidelity customers, and therefore have a specific need for investment services. It is only by servicing these individuals on behalf of Fidelity that Ritter was able to learn that these customers have significant investable assets and were interested in investment services.

10.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence. Fidelity derives substantial economic value from preserving its customer data as a trade secret. Although individual customers are periodically

3

subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to Fidelity's trade secret customer data. In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

11.     Fidelity additionally preserves trade secret customer data by requiring VPFCs to execute a standard Fidelity Employee Agreement, in which they agree not to use or disclose Fidelity's confidential information, including customer information, outside of Fidelity. Ritter executed Fidelity's Employee Agreement a number of times in connection with his employment at Fidelity.

12.     Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity does not provide its trade secret customer data to competitors. Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access. In addition to having VPFCs sign Employee Agreements, Fidelity maintains a Corporate Information Protection Policy and educates its employees on the policy. Further, Fidelity employees are not permitted to take, use, or disclose any customer information when they leave Fidelity.

13.     It is my understanding that certain financial institutions have agreed to a "Protocol for Broker Recruiting," frequently referred to as the "Protocol." The Protocol is an agreement governing the movement of registered representatives among those institutions. The Protocol is a forbearance agreement in which signatories agree that registered representatives moving from one signatory firm to another signatory firm may take certain customer information and solicit customers provided they follow the requirements set forth in the Protocol. The Protocol, by its own terms, applies only to financial firms who are signatories to the agreement. Fidelity is not, and has never been, a signatory

4

to the Protocol. To the contrary, Fidelity vigilantly protects its confidential customer information and prohibits its representatives from taking any such information when they resign from Fidelity. A true and accurate copy of the Protocol, obtained from the website of Capital Forensics, the firm which maintains and stores the Protocol, is attached hereto as Exhibit A.

14.     The theft and misuse of Fidelity's trade secret customer information to unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm. Fidelity is irreparably harmed by the actual and threatened loss of customers and customer goodwill caused by unauthorized use of Fidelity's customer information. Fidelity customers have an expectation that their confidential contact and financial information will be protected and not taken or used by departing employees. Indeed, unlike some other brokerage companies, Fidelity does not obtain from its customers the right to use or disclose their information outside of Fidelity. The damage to Fidelity's customer relationships is therefore incalculable as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Ritter improperly misused confidential customer information on behalf of a competitor to solicit Fidelity's customers.

15.     Nor can Fidelity calculate the financial loss it may suffer from the loss of any given account resulting from Ritter's wrongful conduct, because there is no way to know for how long Fidelity might have otherwise retained that customer, nor how much business that customer might have done with Fidelity or referred to Fidelity in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Charles William Meyers

Executed on __7/29__, 2025

# EXHIBIT A

## **PROTOCOL FOR BROKER RECRUITING**

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, <u>provided</u>, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose. If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided.

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization. This information will be transmitted electronically or by fax, and the
requests will be processed by the central back office rather than the branch where the RR was employed. A client who wants to transfer his/her account need only sign an ACAT form.

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements.

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving: (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations; (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR's ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated.

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto. A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory. The protocol will remain in full force and effect with respect to those signatories who have not withdrawn.

Citigroup Global Markets Inc. ("Smith Barney")

By: _____

Name: Kevin McManus
Title: Managing Director and Chief
       Administrative Officer, Private
       Client Branch System


Merrill Lynch, Pierce, Fenner & Smith Incorporated

By: _____

Name: Phil Sieg
Title: Managing Director, Head of Strategic
       Leadership and Development


UBS Financial Services Inc.

By: _____ EVP

Name: Barry Buchsbaum
Title: Director of Strategic Development
       Executive Vice President

- 3 -