UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) |
| Plaintiff, | ) CIVIL ACTION NO. 25-cv-09225 |
| v. | ) Judge Andrea R. Wood |
| ADAM RITTER, | ) Mag. Judge Gabriel A. Fuentes |
| Defendant. | ) |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Defendant Adam Ritter ("Adam" or "Defendant"), through his attorneys Lawrence Kamin, LLC, submits this Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion").

**INTRODUCTION**

The Motion for a Temporary Restraining Order should be denied. Plaintiff and Movant Fidelity Brokerage Services LLC ("Fidelity") has not shown any irreparable harm which justifies granting the extraordinary relief sought on an emergency basis.

A cursory examination of the "facts" set forth in Fidelity's Complaint reveal no basis for believing that Adam is using some trade secret or other confidential information of Fidelity in contacting his clients from Fidelity. Fidelity, for example, does not point to any forensic evidence suggesting that Adam downloaded a client list or rapidly viewed client contact information shortly before he left Fidelity. Nor does Fidelity refer to logs indicating that Adam printed a client list in advance of leaving. Instead, Fidelity relies on the leap of logic that since Adam called and texted clients, he must have stolen confidential information. Given the many sources of publicly available

1

contact information and Adam's sworn explanation[1] of how he reached out to his clients, there is no basis for finding that Fidelity has made the requisite showing that Adam took confidential information.

Similarly, there is no basis for finding that Adam's alleged "solicitation" of clients warrants extraordinary relief. Certainly not an award of the broad, vague Order sought by Fidelity. Adam was entitled to contact clients and inform them of his new position. However, even if Adam's contacts had crossed into impermissible solicitation (which they did not) the Complaint and supporting documents are silent as to the clients and assets under management ("AUM") which have followed Adam. The reason for this is plain. As set forth in Adam's Declaration, only six (6) out of 600 clients have followed Adam in the more than eight months since he left Fidelity and the four plus months he has been at his current employer. The AUM which has transferred is approximately $10 million out of the $1.4 billion in AUM of Adam's former Fidelity clients. As set forth in his Declaration, Adam expects that no more than $13 million in AUM will move to him. There is no reason to invoke the extraordinary remedies sought by Fidelity.

Finally, in the event that any Order is entered, the Order should be more narrowly and precisely drawn than what is proposed by Fidelity and Fidelity should be required to post a bond.

## ARGUMENT

Courts in this Circuit generally apply a two-step analysis when deciding whether to grant injunctive relief. They first determine if there is (1) a likelihood of success on the merits, (2) a threat of irreparable harm, and (3) an inadequate remedy at law. *SKF USA, Inc. v. Bjerkness,* 636 F. Supp. 2d 696, 705 (N.D. Ill. 2009) If those conditions are satisfied, the Court must then (4) balance the hardships, and (5) consider the impact on public interest. *Cavel Int'l, Inc. v.Madigan*,

---

[1] The Declaration of Adam Ritter ("Adam Decl.") Dkt. #13 is attached hereto as <u>Exhibit A</u>.

500 F.3d 544, 547 (7th Cir. 2007) (applying "sliding scale" analysis); *Promatek Indus. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). Conclusory allegations are insufficient and provide easy fodder for the responding party. *PaineWebber Inc. v. Can Am Fin. Grp., Ltd.*, No. 87 C 6890, 1987 WL 16012, at *2 (N.D. Ill. 1987) (denying TRO that failed to supply the Court with sufficient facts and relied on "bald assertions").

I. **Fidelity Cannot Establish the Existence of Irreparable Harm**

Plaintiff's failure to establish the existence of an emergency undermines the claim of irreparable harm. "A temporary restraining order is a drastic, emergency remedy which may issue only in exceptional circumstances and for a brief duration." *Jurco v. Stuart*, 110 Ill. App. 3d 405, 408, 442 N.E.2d 633, 635 (1st Dist. 1982). The absence of an emergency negates the necessity of a temporary restraining order, as the remedy is designed to address urgent situations where harm is imminent. *Greenspan v. Mesirow*, 132 Ill. App. 3d 508, 511, 478 N.E.2d 20, 22 (1st Dist. 1985).

Here, no emergency exists. Fidelity has had over eight months since Adam's resignation and four months since Adam became affiliated with Cubit Wealth Management ("Cubit") and NewEdge Capital Group ("NewEdge") to seek injunctive relief. *See* Adam Decl. ¶¶ 3-4. If an irreparable and urgent harm existed, Fidelity could have sought a temporary restraining order months ago, not four months before the one-year restrictive covenant expires. Fidelity essentially waived any right to seek such a drastic remedy. No irreparable harm exists and Fidelity has an adequate remedy at law.

This is particularly true here where Fidelity makes no credible argument that money damages would not be sufficient to compensate Fidelity for the minimum number of clients who have followed Adam. Fidelity has a remedy against Adam in a FINRA arbitration for any lost revenue. This is especially true when there is no basis to believe that a significant number of clients

3

will follow Adamn during the period before December 19, 2025. Fidelity should not be permitted to impose the extra burden of federal court litigation on Adam under the facts presented.

### a. Defendant Had No Opportunity to Remove Confidential Information from Fidelity[2]

Plaintiff has failed to introduce any evidence to support its claim that Adam misappropriated confidential information such that Fidelity is entitled to an order compelling the return of information. Fidelity's conclusory allegation that "multiple clients reported that Ritter had texted them, confirming that Ritter had retained the clients' cell phone information," does not warrant extraordinary relief. This is clearly not a case in which Adam was planning his departure from Fidelity. Instead, Adam was forced to immediately resign. Fidelity's Complaint and supporting documents are void of any suggestion that Adam stole information. Adam, however, has explained how he obtained contact information used to notify certain clients of Adam's new position. There is no basis to find that Fidelity has sustained its burden of showing misappropriation of confidential information which would establish some type of irreparable harm. The request for an injunction should be denied.

### b. Defendant's Contact with His Customers is Not Actionable as "Solicitation"

Plaintiff has failed to introduce any evidence tending to suggest that Adam "solicited" the customers he serviced at Fidelity. Plaintiff proffers no evidence of "solicitation" as opposed to mere contact. Merely contacting or sending customers an announcement or notice that their broker has changed investment firms does not constitute solicitation. *See, e.g., Capstone Fin. Adv's v. Plywaczynski*, 2015 IL App (2d) 150957, ¶11 (affirming denial of temporary restraining order sought against a departing financial planner). Indeed, courts here have held:

> It would be unlawful, as well as unreasonable, for [the brokerage company] to seek to prohibit [the broker] from giving his former customers an announcement of his

---

[2] This discussion is also relevant to Fidelity's lack of a reasonable likelihood of success on the merits.

> intent to move to other employment and notice where he could be reached should the customer wish to contact him …. "Otherwise customers with longstanding trust in their brokers with immediate need of advice would not be able to contact them."

*Merrill Lynch, Pierce, Fenner & Smith v. O'Connor,* 194 F.R.D. 618, 620 (N.D. Ill. 2000). Again, Fidelity cannot show a likelihood of success on the merits nor any irreparable harm.

### c. *Professional Rules and Public Policy Dictate that Announcements Cannot be Solicitation*

Rules governing the brokerage profession hold that any restraint on customers moving their accounts violates regulatory rules, which, in turn, precludes judicial enforcement. *See Dowd & Dowd, Ltd. v. Gleason,* 284 Ill. App. 3d 915, 932-33 (1st Dist. 1996), *aff'd in part and rev'd in part on other grounds*, 181 Ill.2d 460 (1998) (refusing to enforce restrictive covenant that violated disciplinary rules governing lawyers); *Prudential Securities, Inc. v. Plunkett*, 8 F. Supp. 2d at 514, 520 (E. D. VA. 1998) (equating, for this purpose, broker-client relationship with lawyer-client relationship). FINRA Rule 2140 expressly forbids a FINRA member, such as Fidelity, from seeking to enjoin, or otherwise interfering with, customers' rights to transfer their accounts:

> No member or person associated with a member shall *interfere* with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account.

FINRA Rule 2140; NASD Notice to Members No. 02-07 (emphasis); FINRA Notice 19-10; *Accord,* The North American Securities Administrators Association *Statement on Brokerage Account Transfers* (November 19, 2001) ("State securities regulators believe, as a matter of public policy, that customers should have both freedom to choose their brokers and full and free access to their accounts.").

5

Moreover, Adam is also a Certified Financial Planner, the CFP Rules require that brokers keep clients timely informed of all important information. This includes the way to contact their brokers. By seeking an order that would stop Adam from providing his contact information to clients, Fidelity chills and "interferes" with customers' right to transfer accounts.[3]

## II. Fidelity's Proposed Injunction Lacks Reasonable Detail

Fidelity's proposed injunction is not sufficiently specific to put Adam on notice of the conduct that would and would not violate the Order.

Rule 65 (d)(1)(C) of the Federal Rules of Civil Procedure requires that every injunction and restraining order must "Describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." The Supreme Court has recognized that this is more than a technical requirement. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The purpose of Rule 65(d)'s requirements is "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id*. The Supreme Court stated that "since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id*. Here, basic fairness and due process require that Adam be informed in reasonable detail "the act or acts restrained or required" by the Panel. Fidelity's proposed injunction provides no such detail.

## III. Public Policy and the Balance of Equities Favor Denial of the Temporary Restraining Order

---

[3] The fiduciary obligations under the new Regulation BI requires firms and brokers servicing/intending to service accounts to put the interest of customers before the firm. *See* 17 C.F.R. 240 (Under the new rule, fiduciaries are bound by trust law standards of care and "undivided loyalty" to their clients and are to be held accountable when they breach those obligations). Merely disclosing contact information serves to protect customers' interests. Ultimately, it is the customers' right to choose who they wanted to service their accounts. Fidelity's Motion and Complaint seeks to interfere with that choice, contrary to the fiduciary standards envisioned under the rule.

Neither Public Policy nor the balance of harms favors entry of a temporary restraining order. As noted above, both FINRA and Courts recognize a strong public policy in favor of affording customers the right to choose who will manage and invest their life savings. FINRA Rule 2140; *Merrill Lynch,* 572 F. Supp. at 249. In its efforts to maintain its own market share, Plaintiff ignores the interests of the customers whose choice would be unfairly limited by the requested temporary restraining order. Public policy weighs against a temporary restraining order.

The balance of harms weighs against entry of a temporary restraining order too. Fidelity would be harmed far less by denial of a temporary restraining order than Adam will be harmed if one is granted, which would cause him "profound injury … were the Court to issue an injunction." *Fidelity Brokerage Services v. Hoffman and JP Morgan Securities, LLC*, 17-cv-02831, ECF #16 at 11. Here, Fidelity has an adequate remedy at law and any harm to Plaintiff if the temporary restraining order is not granted would be infinitesimal.

**IV.     Fidelity Must Post a Bond If the Court Grants the Temporary Restraining Order**

Federal Rule of Civil Procedure 65(c) requires the plaintiff seeking a temporary restraining order "to post a bond sufficient to 'pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.'" *Venus Laboratories, Inc. v. Vlahakis*, No. 15 C 1617, 2015 U.S. Dist. LEXIS 27171, at p. 14 (N.D. Ill. Mar. 5, 2015). The purpose of an injunction bond is to compensate the defendant for the harm caused by an injunction should the defendant ultimately prevail on the merits. *Ty, Inc. v. Publications International*, 292 F.3d 512, 516 (7th Cir. 2002).

As detailed above, Adam will be harmed if an injunction order is entered. Because Fidelity will be unable to prove successful prove the merits of the causes of action asserted against Adam, Fidelity must be required to secure a bond if an injunction is entered. Moreover, Rule 65 excludes the United States, its officers, and its agencies from the requirement to give security. *See* Fed. R. Civ. Pro. 65(c). Fidelity does not fall within the explicit exception of the Rule and must post bond if it prevails.

## CONCLUSION

For the foregoing reasons, Defendant asks this Court to deny Plaintiff's Motion and require Plaintiff to seek resolution of any damages claim through arbitration before the Financial Industry Regulatory Association.

Dated: August 5, 2025

Respectfully submitted,
By: s/Theodore E. Harman

John S. Monical, Esq. (jmonical@lawrencekaminlaw.com)
Theodore E. Harman, Esq. (tharman@lawrencekaminlaw.com)
Katelyn M. Hodgman, Esq. (khodgman@lawrencekaminlaw.com)
Lawrence Kamin, LLC
300 South Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 372-1947

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, certify that I electronically filed Defendant's Memorandum of Law In Opposition to Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction with the Clerk of the Court using the CM/ECF system on August 5, 2025. Pursuant to Fed. R. Civ. P. 5(b)(3) and the Northern District of Illinois' LR 5.9, I have thereby electronically served all Filing Users with a copy of Defendant's Memorandum of Law In Opposition to Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction.

      /s/ *Theodore E. Harman*
Theodore E. Harman
Attorney for Defendant, Adam Ritter

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ADAM RITTER, ) <br> ) <br> Defendant. ) <br> ) <br> _____ ) | CIVIL ACTION NO. 25-cv-009225 |

## DECLARATION OF ADAM RITTER

Adam Ritter, under penalty of perjury, declares and says:

1. I have been employed in the securities services industry since 2008 when I began working as a registered representative of Ameriprise Financial ("Ameriprise"). Prior to joining Fidelity Brokerage Services, LLC ("Fidelity"), I also worked for Wells Fargo and then TD Ameritrade where I served as a financial consultant and branch manager.

2. In May 2016, I began working for Fidelity as a registered representative providing financial advice to clients. I continued working as a registered representative of Fidelity until December 19, 2024 when I left Fidelity.

3. I did not plan to leave Fidelity in December 2024. Instead, in December 2024 Fidelity claimed that I engaged in "inappropriate unprofessional conduct" and indicated that I would be terminated if I did not choose to resign. I therefore resigned from Fidelity without any plan for new employment.

4. After searching for employment in early 2025, in April 2025, I joined Cubit Wealth Management ("Cubit") as a registered representative. Cubit offers securities and advisory services.

through New Edge Capital Group ("New Edge"), a Registered Investment Adviser, Member FINRA/SIPC.

5. During my tenure in the securities industry, including during my time at Fidelity and now at Cubit, I was and am obligated to put the interests of my clients first and act in their best interest.

6. During my tenure at Fidelity and currently at Cubit, clients interacted with me as a financial planning professional certified by the CFP® Board. CFP® professionals are required to adhere to the CFP® Board's Code of Ethics and Standards of Conduct ("Code"). The Code requires, among other things, that a CFP® professional update any information about the professional or the professional's firm that a reasonable client would consider material or important in making a decision about whether to continue to engage the professional or the firm. Fidelity placed my CFP® designation on my business cards and email signature lines essentially promising clients that I would comply with the Code. Because my clients depend on me for advice and management concerning their investment accounts, retirement, and livelihoods, and because of my duty to put their interests first, I notified some clients concerning my move to Cubit and provided FINRA Rule 2273 disclosures to the extent required by the rules. As discussed below, I tried to do this while abiding by the terms of my agreement with Fidelity.

**I Understood I Could Not Remove Confidential Information When I left Fidelity And I Had No Opportunity To Do So.**

7. I understood I could not remove confidential information when I left Fidelity and I had no opportunity to do so. When I left Fidelity, I did not take any information regarding Fidelity's client with me. I did not print or otherwise copy or download client contact information. While I understood that it would be inappropriate to take some information, until I was forced to resign on December 19, 2024 I intended to continue to work for Fidelity and believed that I would continue

do so for the indefinite future. Following my resignation, I no longer had access to any client information.

8. I did not remove any Fidelity confidential documents or property prior to leaving or when I left. I did not print, photograph, or download any information from Fidelity's systems. I did not leave with any list of my clients or their names, addresses, phone numbers, account numbers, social security numbers, investment history, investments held, assets under management, risk tolerance, goals and objectives, client files, accounts statements, or the like. I did not take any of this information in any form when I left. I did not take any paper or electronic data of any kind.

9. After I resigned from Fidelity, I did contact certain of my clients using LinkedIn to let them to let them know that I was no longer at Fidelity. This included clients to whom I was connected with on LinkedIn prior to my departure as well as clients whom I looked up on LinkedIn and asked to connect. With respect to clients to whom I was connected with on LinkedIn at the time of my resignation, as set forth in my Affidavit dated May 2, 2025 (and attached to the Declaration of Richard Wulforst as Exhibit I) once I was made aware of Fidelity's Social Media Policy, I voluntarily disconnected from those clients on LinkedIn. I thereafter did send new requests to connect with those clients.

10. Beginning in early March 2025, after I committed to joining Cubit I used publicly available sources such as Whitepages (for which I purchased a subscription), FastPeopleSearch.com (a free internet resource), Google and the LinkedIn messaging system to reach out to approximately 200 clients to let them know that I would be joining Cubit and providing my contact information. These were clients whose names I could independently remember following my departure and I did not use any list created during the time I was employed by Fidelity.

11. In communicating with these clients, I did not overtly ask or otherwise try to persuade them to follow me to Cubit. Instead, I provided contact information and, if asked, responded to questions concerning my position with Cubit and the firm's capabilities.

12. In some instances where I was not able to speak to clients, I left messages asking for a call back. Those messages, however, did not solicit business from clients and I deny any allegation that I was calling any client every other business day for a few weeks asking them to join me at Cubit.

13. On May 2, 2025, in response to Fidelity's requests made through my lawyer, I did sign the Affidavit attached to the Declaration of Richard Wulforst as Exhibit I. It remains true that I do not possess any confidential information or trade secret information of Fidelity as set forth in Paragraph 2 of the May 2, 2025 Affidavit. As set forth above, any information I have concerning client contact information was obtained from public sources following my resignation.

14. As set forth in my Supplemental Affidavit dated June 6, 2025 (and attached to the Declaration of Richard Wulforst as Exhibit K), I do not believe that my communications with clients prior to June 6, 2025 qualify as solicitation or inducement.

15. After June 6, 2025, my communications to clients have become even more limited. Unless a client had previously contacted me requesting information or made a request for information subsequent to June 6, 2025 I adhered to the commitment made in Paragraph 4 of the June 6, 2025 Affidavit. I did send a number of texts wishing clients a Happy Fourth of July, but I did not otherwise communicate with clients except in response to explicit requests for information.

16. I have not "badmouthed" or otherwise denigrated Fidelity or any of my former Fidelity colleagues in any communications with clients.

17. I believe that the Complaint is accurate in stating that while I was at Fidelity I had approximately 600 accounts with assets under management (AUM) of approximately $1.4 billion.

Of that $1.4 billion, currently approximately $10 million in AUM from six clients has transferred from Fidelity to Cubit. In addition, other clients have indicated that they may transfer another $3 million or so in AUM from Fidelity to Cubit. Thus, at most I expect that less than $13 million in AUM will transfer from Fidelity to Cubit.

18. I deny the allegations in Paragraphs 7, 9, 48, 68, 69, 72, 73, 75, 76, 78, 80, 81, 88, 90, 92, 100, 103, 105, 109, 112, 113, 114, 117, 118, 120, 121, 124 and 125 of the Complaint in this matter to the extent they allege that I used Fidelity's confidential and trade secret information in any manner, including to unlawfully solicit customers.

19. I deny the allegations in Paragraph 51 of the Complaint in this matter that I "retained" clients cell phone information. As set forth herein, all contact information was obtained from publicly available sources.

20. I deny the allegations in Paragraphs 56, 57, 58, 75, 76, 91, 92, 117, 118, 120, 121, 124 and 125 of the Complaint in this matter to the extent they suggest that in any contact with clients I requested or otherwise solicited clients to move assets unless prompted by a question or request from the client.

21. I deny the allegations in Paragraph 65 of the Complaint in this matter to the extent that they suggest that I have been calling any client multiple times to solicit business for Cubit. Any discussions of the services I could perform at Cubit as well as any follow up calls or meetings occurred only after the client raised such topics or made a request for further information. I never made negative comments concerning Fidelity.

22. In conclusion, I acted professionally and appropriately with my clients. I did not take, download or misappropriate any client documents or confidential information of Fidelity. I did not solicit clients before or after leaving Fidelity.

PURSUANT TO 28 U.S.C. §1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT.

EXECUTED: August 5, 2025

Adam Ritter

## CERTIFICATE OF SERVICE

I, the undersigned attorney, certify that I electronically filed the Declaration of Adam Ritter with the Clerk of the Court using the CM/ECF system on August 5, 2025. Pursuant to Fed. R. Civ. P. 5(b)(3) and the Northern District of Illinois' LR 5.9, I have thereby electronically served all Filing Users with a copy of the Declaration of Adam Ritter.

/s/ *Theodore E. Harman*
Theodore E. Harman
Attorney for Defendant, Adam Ritter